1

2
FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

3
Dec 09, 2020

4
SEAN F. McAVOY, CLERK

5              UNITED STATES DISTRICT COURT

6              EASTERN DISTRICT OF WASHINGTON

7    JODIANNE WAGNER,                    NO:  2:19-CV-40-RMP

8                        Plaintiff,
                                         ORDER GRANTING DEFENDANTS'
9         v.                             MOTIONS FOR SUMMARY
                                         JUDGMENT
10   COUNTY OF SPOKANE, a public
     entity; DANIEL MOMAN, an
11   individual; SAMUEL TURNER, an
     individual; MARK BENNER, an
12   individual; ANDRIA
     UNDERWOOD, an individual; and
13   LAURA GARR, an individual also
     known as Laura Serghini,
14
                        Defendants.
15

16        BEFORE THE COURT is Defendants Laura Garr and Andria Underwood's

17   Motion for Summary Judgment, ECF No. 35, and Defendants County of Spokane,

18   Daniel Moman, Samuel Turner, and Mark Benner's Motion for Summary Judgment,

19   ECF No. 47.  The Court has considered the motions, the record, and is fully

20   informed.

21

ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT ~ 1

1

**STATEMENT OF FACTS**

2        In early December 2015, the Wagner family dog, Ruger, attacked a child in

3    the home.  ECF Nos. 38-1 at 5–6; 42 at 2.  This was the third time Ruger had

4    attacked one of the Wagner children.  ECF No. 38-1 at 5.  Ruger previously had

5    caused injury to a child when the children were home alone.  *Id.* at 7.

6        Child Protective Services (CPS) Investigator Tracie Arnold was assigned to

7    investigate the incident involving Ruger's attack on a child in December 2015.  ECF

8    No. 37 at 2.  As part of her investigation, Ms. Arnold met with Plaintiff Ms.

9    Jodianne Wagner (Loran) to discuss Ruger's remaining in their home.  *Id.*  At the

10   conclusion of the meeting, Ms. Wagner agreed to place Ruger in an animal hospital

11   and then re-home the dog.  *Id.*; ECF No. 38-1 at 6.   However, on December 21,

12   2015, Ms. Arnold received information that Ruger had returned to the Wagner home.

13   ECF No. 37 at 2.  Ms. Arnold was unable to confirm whether Ruger had in fact

14   returned to the home.  *Id.*  On January 20, 2015, Ms. Arnold closed her investigation

15   into the December 2015 incident with a "high" Structured Decision Making (SDM)

16   risk score.  ECF No. 37 at 3.  An SDM risk assessment is a tool used to assess and

17   promote the safety and well-being for children and other vulnerable individuals.  *Id.*

18       On January 29, 2016, CPS received a referral from Debbie Wiechert, a social

19   worker at Meadow Ridge Elementary School, alleging that Ruger had returned to the

20   family home.  ECF Nos. 40 at 2; 44 at 2.  An intake report was generated based on

21   the referral.  ECF Nos. 40 at 2; 40-1.  CPS Intake Supervisor Melissa Kehmeier

ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT ~ 2

1    reviewed the intake and believed that due to the dog's history, the intake warranted

2    an emergent response and that the dog should be considered very dangerous.  ECF

3    No. 40 at 2.  CPS Supervisor Cameron Norton requested an emergent initial face-to-

4    face ("IFF") interview.  ECF Nos. 42 at 3; 42-1.

5        On January 29, 2016, around 7:00 p.m., CPS Social Workers Laura Garr and

6    Andria Underwood arrived at the Wagner home.  ECF Nos. 39 at 2; 43 at 2.  Ms.

7    Garr and Ms. Underwood waited approximately one hour for law enforcement to

8    arrive.  ECF Nos. 39 at 3; 43 at 3.  It is allegedly common practice to request law

9    enforcement assistance if there is concern for social worker safety or the safety of

10   children in the home.  ECF Nos. 39 at 2; 43 at 2.  Spokane County Sheriff's Deputy

11   Mark Benner and Deputy Sam Turner responded to the call.  ECF Nos. 50 at 2, 7–8;

12   51 at 2.  Deputy Daniel Moman responded as backup.  ECF No. 52 at 2.  After the

13   Deputies arrived around 8:00 p.m., the Social Workers and Sheriff's Deputies

14   (collectively the "individual Defendants") proceeded to the front door.  ECF No. 39

15   at 2–3; 43 at 3.

16       The eldest Wagner child home at that time, M.E.W., opened the door.  ECF

17   No. 417 at 3.  Neither Ms. Wagner nor her husband was home at the time.  ECF

18   38-1 at 3, 8.  Ms. Wagner had left M.E.W. in charge of her younger siblings.  ECF

19   Nos. 38-1 at 8; 38-2 at 3.  M.E.W. was 14 years old at the time.  ECF No. 2 at 8.

20       Ms. Garr and Ms. Underwood identified themselves to M.E.W. and indicated

21   that they were there to see the children and to ensure their safety.  ECF Nos. 39 at 3;

ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT ~ 3

43 at 3.  M.E.W. brought the younger children to the doorway.  ECF No. 38-2 at 5.

The individual Defendants eventually entered the home and Ms. Garr and Ms.

Underwood checked on the food supply and sleeping arrangements.  ECF Nos. 38-2

at 5; 39 at 3; 43 at 3.  This is allegedly standard practice whether or not these

deficiencies are identified in the intake which lead to an IFF visit.  ECF Nos. 39 at 3;

43 at 3.  M.E.W. showed Ms. Garr and Ms. Underwood the children's bedrooms in

addition to the food available in the home.  ECF No. 38-2 at 8.  After approximately

20–30 minutes at the Wagner residence, the individual Defendants left the home,

and no children were taken into state custody.  ECF Nos. 38-2 at 8; 39 at 4; 43 at 3.

Ms. Wagner filed suit against the individual Defendants asserting claims

under 42 U.S.C. § 1983 for alleged violations of procedural due process, unlawful

seizure, invasion of privacy, and the interruption of familial association.  ECF No. 2

at 20.  Ms. Wagner also seeks to hold the County of Spokane liable under *Monell v.*

*Dep't of Social Servs.*, 436 U.S. 658 (1978).  ECF No. 2 at 26.  Defendants move for

summary judgment on all claims.  ECF Nos. 35; 47.

## LEGAL STANDARD

A party is entitled to summary judgment when the "pleadings, depositions,

answer to interrogatories and admissions on file, together with the affidavits, if

any, show that there is no genuine material issue of fact and that the moving party

is entitled to summary judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact

is material when it "is relevant to an element of a claim or defense and whose

ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT ~ 4

1    existence might affect the outcome of the suit." *T.W. Elec.Serv., Inc. v. Pac. Elec.*

2    *Contractors Ass'n*, 809 F.2d 626 (9th Cir. 1987). "Where the record taken as a

3    whole could not lead a rational trier of fact to find for the nonmoving party, there is

4    no genuine issue for trial." *Matsushita Elec. Indus. Co., v. Zenith Radio Corp*., 475

5    U.S. 574, 587 (1986).

6        Once the moving party satisfies its burden by showing that it is entitled to

7    judgment as a matter of law, "its opponent must do more than show that there is

8    some metaphysical doubt as to material facts . . . the nonmoving party must come

9    forward with 'specific facts showing that there is a genuine issue for trial.'"

10   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586-87 (1986)

11   (internal citations omitted). The mere existence of a scintilla of evidence in support

12   of the non-moving party's motion position is not sufficient. *Triton Energy Corp. v.*

13   *Swear D. Co*., 68 F.3d 1216, 1221 (9th Cir. 1995).

14                        **DISCUSSION**

15       Ms. Wagner brings her constitutional claims against Defendants through 42

16   U.S.C. § 1983. Relief under § 1983 requires a plaintiff to show "(1) a violation of

17   rights protected by the Constitution or created by federal statute, (2) proximately

18   caused (3) by the conduct of a 'person' (4) acting under the color of state law."

19   *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). If the government official

20   did not violate the claimant's rights under the Constitution or rights created by

21

ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT ~ 5

1  federal statute, there is no relief available under § 1983.  *Nurre v. Whitehead*, 580

2  F.3d 1087, 1092 (9th Cir. 2009).

3      The individual Defendants assert that they are entitled to qualified immunity

4  on all claims.  ECF Nos. 35 at 7; 47 at 10.  To determine the applicability of

5  qualified immunity, the court must decide (1) whether the defendant's conduct

6  violated a constitutional right; and (2) whether the identified constitutional right was

7  clearly established at the time of the alleged violation.  *Tuuamalemalo v. Greene*,

8  946 F.3d 471, 476–77 (9th Cir. 2019).  As part of the second inquiry, the court also

9  considers whether the defendant's interpretation of the law was reasonable at the

10  time, given the factual context.  *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061

11  (9th Cir. 2006).

12      The Court first turns to the shared inquiry under both § 1983 and qualified

13  immunity regarding the alleged violation of constitutional rights.

14  **I.    Violation of Constitutional Rights**

15      **A. Right to Familial Association**

16      Ms. Wagner claims that the Defendants deprived her of the constitutionally

17  protected liberty interest in familial association under the First, Fourth, and

18  Fourteenth Amendments.

19      The First Amendment protects "family relationships, that presuppose 'deep

20  attachments and commitments to the necessarily few other individuals with whom

21  one shares not only a special community of thoughts, experiences, and beliefs but

ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT ~ 6

1   also distinctively personal aspects of one's life.'"  *Lee v. City of Los Angeles*, 250

2   F.3d 668, 685 (9th Cir. 2001) (quoting *Board of Dirs. of Rotary Int'l v. Rotary Club*,

3   481 U.S. 537, 545 (1987)).  Protecting family relations "from unwarranted state

4   interference" is necessary to safeguard the ability to define one's identity which is

5   central to the concept of liberty.  *Keates v. Koile*, 883 F.3d 1228, 1236 (9th Cir.

6   2018) (citing *Roberts v. United States Jaycees*, 468 U.S. 609, 619, (1984)).

7        The Court evaluates "the claims of children who are taken into state custody

8   under the Fourth Amendment right to be free from unreasonable seizures rather

9   than the Fourteenth Amendment right to familial association."  *Keates*, 883 F.3d at

10  1236.  Thus, the Court will address separately the issues arising from the alleged

11  "seizure" of M.E.W. and search of the Wagner family home under the Fourth

12  Amendment *infra*.

13       The Fourteenth Amendment prohibits states from depriving "any person of

14  life, liberty, or property, without due process of law."  U.S. CONST. amend. XIV § 1.

15  "[T]he interest of parents in the care, custody, and control of their children" has been

16  long recognized by the courts as a fundamental liberty interest.  *Troxel v. Granville*,

17  530 U.S. 57, 65, (2000).  The right to familial association has both a substantive and

18  a procedural component.  *Keates*, 883 F.3d at 1236.  "While the right is a

19  fundamental liberty interest . . . officials may interfere with the right if they 'provide

20  the parents with fundamentally fair procedures.'"  *Id.* (quoting *Santosky v. Kramer*,

21  455 U.S. 745, 753–54 (1982)).

ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT ~ 7

1    The Ninth Circuit has held that to assert a cognizable Fourteenth Amendment

2    claim "plaintiffs must establish that an actual loss of custody occurred; the mere

3    threat of separation or being subject to an investigation, without more, is

4    insufficient." *Dees v. County of San Diego*, 960 F.3d 1145, 1152 (9th Cir. 2020)

5    (social worker did not violate mother's Fourteenth Amendment familial association

6    right by interviewing daughter at school). "A cause of action does not lie where the

7    social worker is accused of seizing a child and the parent has not 'actually lost'

8    control over the child." *Id.* at 1153 (quoting *Capp v. County of San Diego,* 940 F.3d

9    1046, 1060 (9th Cir. 2020) (finding no violation of the liberty interest in familial

10    relations where children were interviewed by social workers at school and father was

11    subject to an investigation)). In other words, an investigation of the parent or child

12    does not amount to deprivation of one's liberty interest in familial association.

13    The courts have "woven these constitutional threads into a discrete

14    constitutional right in cases where state officials remove children from parents

15    without consent or due process." *Keates*, 883 F.3d at 1236 (9th Cir. 2018). "In sum

16    . . . the rights of parents and children to familial association under the Fourteenth,

17    First, and Fourth Amendments are violated if a state official removes children from

18    their parents without their consent, and without a court order, unless information at

19    the time of the seizure, after reasonable investigation, establishes reasonable cause to

20    believe that the child is in imminent danger of serious bodily injury, and the scope,

21

ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT ~ 8

degree, and duration of the intrusion are reasonably necessary to avert the specific

injury at issue." *Id.* at 1237–38.

Here, the IFF visit conducted by the Social Workers and Sheriff's Deputies

at the Wagner home did not amount to "unwarranted state interference" in

violation of the First Amendment.  The IFF visit was the result of a referral by a

mandatory reporter alleging that a potentially dangerous dog had returned to the

family home.  ECF Nos. 40 at 2; 44 at 2.  CPS determined that the intake

warranted an emergent response and that the dog should be considered dangerous.

ECF No. 40 at 2.  To the extent that the IFF visit amounted to "state interference,"

the Court finds that the interference was justified because there was legitimate

concern for the safety of the Wagner children, as well as the safety of the Social

Workers conducting the visit due to a potentially dangerous animal.  Accordingly,

the evidence shows that Ms. Wagner was not deprived of the right to familial

association under the First Amendment.

Additionally, the Social Workers and Sheriff's Deputies did not deprive Ms.

Wagner of her right to familial association under the Fourteenth Amendment.

None of the Wagner children was removed from the home or taken into state

custody on January 29, 2016.  ECF Nos. 38-2 at 9; 39 at 4; 43 at 4.  Because "a

cause of action does not lie where the [defendant] is accused of seizing a child and

the parent has not 'actually lost' control over the child[ren]," Ms. Wagner's claim

that Defendants deprived her of the right to familial association under the

Fourteenth Amendment also fails as a matter of law.

The Court concludes that the Defendants did not violate Ms. Wagner's right

to familial association under either the First Amendment or the Fourteenth

Amendment.  Therefore, Defendants are entitled to summary judgment with

respect to Ms. Wagner's § 1983 claim premised on the right to familial association

and the alleged deprivation of that right without due process.  *See Dees*, 960 F.3d

at 1153.

**B. Fourth Amendment**

**1.  Entry & Search of the Wagner Home**

Ms. Wagner also brings suit through § 1983 alleging that Defendants violated

the Fourth Amendment by entering and searching the Wagner family home without

a warrant and absent exigent circumstances or consent.  ECF No. 2 at 21.

Defendants argue that they are entitled to summary judgment because the evidence

establishes that they lawfully entered the Wagner family upon receiving consent

from Ms. Wagner's daughter, M.E.W.

Government officials cannot coerce entry into people's homes without a

search warrant or the applicability of an established exception to the warrant

requirement.  *Calabretta v. Floyd*, 189 F.3d 808, 813 (9th Cir. 1999).  The

prohibition against a warrantless entry does not apply to "situations in which

voluntary consent has been obtained either from the individual whose property was

ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT ~ 10

searched or from a third party who possesses common authority over the premises."

*Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) (internal citations omitted).

The *Ferrier* rule, which requires police officers to advise citizens of their right to refuse entry, is limited to situations where police seek to conduct a search for contraband or evidence of a crime without a search warrant. *State v. Williams*, 11 P.3d 714, 720 (Wash. 2000) (discussing *State v. Ferrier*, 960 P.2d 927 (Wash. 1998)); *see also State v. Bustamante-Davila*, 983 P.2d 590, 598 (Wash. 1999) ("The police officers in this case did not proceed to Petitioner's residence with the intent to find contraband without obtaining a search warrant.  They merely accompanied the INS agent as backup").  To apply the *Ferrier* rule every time an officer enters a home "would unnecessarily hamper a police officer's ability to investigate complaints and assist the citizenry."  *Williams*, 11 P.3d at 720.

Here, the Social Workers and Sheriff's Deputies were seeking to confirm that the Wagner children were safe.  The Sheriff's Deputies, specifically, were there to provide standby assistance to the Social Workers due to a potentially dangerous dog on the premises, and "were not conducting a law enforcement investigation."  ECF Nos. 38-2 at 14, 50 at 2–3, 51 at 3.  Once inside the home, the Sheriff Deputies remained in the "living space" and did not interview M.E.W.  ECF Nos. 38-2 at 16, 50 at 4.  Accordingly, the interaction at issue was not a "knock and talk" circumstance subject to the procedure set forth in *Ferrier*.

The Court turns to (1) whether M.E.W. had actual or apparent authority to consent to the individual Defendants' entry and search of the home; (2) whether M.E.W. exercised this authority and gave the individual Defendants consent; and (3) whether Ms. Wagner's objection to the individual Defendants' entry and search negates the alleged consent.

### i. Actual or Apparent Authority

Ms. Wagner argues that "[a] fourteen year old can't give consent for a search of her parent's home, her sibling's bedrooms, or her parent's bedroom." ECF No. 55 at 12.

Consent by a third party to a search of common premises is effectual if the third party has either actual authority or the apparent authority to authorize the search. *Rodriguez*, 497 U.S. at 188. A party has actual authority to consent to a search if either "the owner . . . has expressly authorized the third party to give consent or if the third party has mutual use . . . and joint access or control" over the premises. *United States v. Fultz*, 146 F.3d 1102, 1105 (9th Cir. 1998). "Common authority" derives from "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right" United States v. Matlock, 415 U.S. at 171 n. 7 (1974). In determining whether a third party has "common authority," courts also consider whether others in the home

ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ~ 12

1   have assumed the risk that the third party might permit the search. *United States v.*

2   *Matlock*, 415 U.S. 164, 171 n. 7 (1974).

3       Here, the Court finds that M.E.W. had the actual authority to provide consent

4   to entry because her parents had left her in charge of the home and the younger

5   children residing there. *See State v. Summers*, 764 P.2d 250, 252 (Wash. App. 1998)

6   (finding that older sister was acting as head of the household while mother was out

7   of town and, consequently, had the same authority to consent to search of room as

8   the mother would have).  In her mother and father's absence, M.E.W. was more than

9   just a babysitter, but rather acting as head of the household and had the same

10   authority to consent to a search of the Wagner home as her parents would have if

11   they were present. *See id.*; ECF No. 38-2 at 4, 9–10.

12       Furthermore, M.E.W. had shared use and joint access to the home and

13   different rooms therein.  ECF No. 38-2 at 4.  In addition to providing for the younger

14   children, M.E.W. was a resident of the home.  ECF No. 1 at 13–14.  Thus, she had a

15   "sufficient relationship to the premises sought to be inspected." *Matlock*, 415 U.S.

16   at 171 (1974).  Even if M.E.W. did not have joint access to her parents' master

17   bedroom, the evidence shows that the welfare check was limited to the children's

18   sleeping arrangements.  ECF Nos. 38-2 at 22, 39 at 3, 43 at 3, 43-1 at 3.

19       Although there is no evidence that Ms. Wagner expressly gave M.E.W.

20   authority to allow law enforcement and social workers into the house, there also is

21   no evidence supporting that M.E.W. was directed not to allow law enforcement and

ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT ~ 13

1    social workers into the home.  Rather, M.E.W. testified that, when she is home alone

2    with her younger siblings, she is put in charge of who is allowed to come into the

3    home.  ECF No. 38-2 at 9.  Thus, Ms. Wagner assumed the risk that M.E.W. would

4    allow others into the home by leaving her home alone and in charge.  ECF No. 42 at

5    3; *see also United States v. Lacey*, 225 Fed. Appx. 478, 480 (9th Cir. 2007).

6        In the alternative, the Court finds that M.E.W. had apparent authority to

7    provide consent.  "Under the apparent authority doctrine, a search is valid if the

8    government proves that the officers who conducted it reasonably believed that the

9    person from whom they obtained consent had the actual authority to grant that

10   consent." *United States v. Arreguin*, 735 F.3d 1168, 1175 (9th Cir. 2013).  Apparent

11   authority is measured by an objective standard of reasonableness. *United States v.*

12   *Ruiz*, 428 F.3d 877, 880 (9th Cir. 2005).  In assessing whether an officer's belief was

13   objectively reasonable, the court considers "the facts available to the officer at the

14   moment." *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990).

15       Here, the individual Defendants determined through questioning M.E.W. that

16   M.E.W. had joint control over and was presently in charge of the Wagner home.

17   ECF Nos. 39 at 3; 43 at 3; 51 at 3.  This belief that M.E.W. had authority over the

18   home was objectively reasonable, because she was the oldest person in the house

19   with younger children present.  The surrounding circumstances would not cause a

20   reasonable person to doubt that M.E.W. was a resident of the home with joint access

21   to parts of the home. *Contra United States v. Reid*, 226 F.3d 1020 (9th Cir. 2000)

ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT ~ 14

1  (finding it was unreasonable to presume occupant who answered the door resided in

2  apartment without further questioning); *see also United States v. Clutter*, 914 F.2d

3  775, 777 (6th Cir. 1990) ("There is every reason to suppose that mature family

4  members possess the authority to admit police to look about the family residence,

5  since in common experience family members have the run of the house.").

6      In addition, the evidence supports that Ms. Wagner believed that M.E.W., at 14

7  years old, was of suitable age to look after her younger siblings as well as the home

8  itself.  ECF Nos. 38-1 at 8; 38-2 at 4.  In turn, it was reasonable for the individual

9  Defendants to believe that M.E.W., as the eldest present looking after younger

10 children, had the authority to authorize their entry into the home notwithstanding the

11 parents' absence.  *See State v. Jones*, 591 P.2d 796, 799 (Wash. App. 1979) ("Some

12 minors, simply by reason of their age or immaturity, may be incapable of consenting

13 to a police entry; others may be overawed and will permit entry despite strict

14 parental instructions or admonitions not to permit an entry. The record in this case

15 appears to be devoid of either impediment.");  *see also United States v. Peden*, No.

16 CR. 06-0300 WBS, 2007 WL 2318977 at *5 (E.D. Cal. Aug. 13, 2007) (upholding

17 search conducted pursuant to third-party consent by two teenagers, age 14 and 17, in

18 accord with decisions in the Sixth, Tenth, and Eleventh Circuits); *Clutter*, 914 F.2d

19 at 777 (upholding consent provided by 12 and 14 year-old children who were

20 routinely left in exclusive control of the house).

21

ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT ~ 15

1    Finding that M.E.W. had actual authority, and alternatively apparent authority,

2    to provide consent, the Court turns to whether M.E.W. voluntarily exercised this

3    authority and provided the individual Defendants with consent to enter and search

4    the home.

5    **ii.    Consent**

6    Whether a party's consent was voluntarily given is dependent on the totality

7    of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).

8    Evidence of a party's mere acquiescence or submission is insufficient to establish

9    that consent was freely given. *United States v. Shaibu*, 920 F.2d 1423, 1426 (9th

10    Cir. 1990).

11    The parties disagree about how the interaction at issue between M.E.W. and

12    the Defendants unfolded. Per Defendant Underwood's case notes entered

13    immediately after the IFF visit, the Social Workers "asked if they could [ ] make

14    sure that [the children] had some food to eat while their parents were gone.

15    [M.E.W.] allowed SWs and LE inside." ECF Nos. 43 at 4; 43-1 at 3. M.E.W.

16    showed them the food supply. ECF No. 38-2 at 8. "SWs then asked if they could

17    see w[h]ere everyone sleeps." ECF Nos. 43 at 4; 43-1 at 3. M.E.W. walked the

18    Social Workers down the hallway and showed them the bedrooms. ECF No. 38-2 at

19    8. The Sheriff's Computer Aided Dispatch ("CAD") report corroborates Defendant

20    Underwood's case notes: "Child allowed CPS to enter res[idence] to check on

21    siblings. Parents not home. CPS satisfied with report. No AEP. Assist only." ECF

ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT ~ 16

No. 50 at 8.  Deputy Benner's daily observations report, as the Field Trainer for

Deputy Turner, provides the following account:

> After making a plan [Deputy Turner] went to the home and seemed
> uncomfortable talking with the teenage female who answered the door.
> [Deputy Turner was] able to ask enough questions to get into the home
> to do the welfare check.  [Deputy Turner] stood blocking CPS' ability
> to get into the home and after telling [Deputy Turner] to move out of
> their way [Defendants] were able to enter the home and perform the
> check which yielded negative results for safety issues pertaining to the
> children.

ECF No. 58-1 at 1.[1]

     However, Ms. Wagner claims that the Social Workers did not ask M.E.W.

for permission to come inside and that if M.E.W. provided consent, it was not

voluntary as she "felt stressed because there were five people [she] didn't know who

were already walking into the house."  ECF No. 38-2 at 5–6.  M.E.W. testified that

although she did not expressly tell the Social Workers and Sheriff's Deputies "no"

---

[1] Defendants object to the documentary evidence provided by Ms. Wagner in
response to the Motions for Summary Judgment on the basis that they are not
properly authenticated.  However, Deputy Mark Benner testified to acting as the
field training officer for Deputy Sam Turner on January 29, 2016.  ECF No. 50 at
2.  The report's content shows that the relevant observations are related to a call at
3625 E. Norwood Road, Case No. 160034667.  These details match the CAD
Incident Report provided by Defendants.  ECF No. 50 at 6–7.  Accordingly, there
is sufficient indicia of reliability that the Field Trainer's Observations report
proffered by Ms. Wagner is a true and authentic copy.  Furthermore, the document
was produced by Defendants in discovery.  ECF No. 58 at 2.

ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT ~ 17

1    with respect to entering the home, that she "advised them to come back when [her]

2    parents [were there]" because she was babysitting.  ECF No. 38-2 at 17.

3          The Court finds that in light of the officials' training and experience, in

4    addition to documentary evidence corroborating their accounts of the exchange, that

5    the Social Workers and Sheriff's Deputies obtained consent from M.E.W. prior to

6    entering and briefly searching the Wagner family home.  As noted above, Defendant

7    Underwood's case notes and the Sheriff's Deputies' CAD report, made

8    contemporaneously with and entered immediately after the IFF visit, both show that

9    M.E.W. allowed the officials to enter.  ECF Nos. 43-1 at 3; 50 at 8.

10         The record is also clear that the Individual Defendants knew based on their

11   training and experience that absent consent or exigent circumstances that a warrant

12   is required for entry.  ECF Nos. 38 at 2; 43 at 2; 50 at 3; 51 at 4; 52 at 2.  The scope

13   of the search was limited to food supply and sleeping arrangements, and there is no

14   evidence that any of the individual Defendants moved or damaged personal property

15   within the home.  ECF No. 38-2 at 18.  Furthermore, the Court finds persuasive

16   Defendants' argument that if Deputy Turner's interaction with M.E.W. had run afoul

17   of the Fourth Amendment, it likely would have been reported as an error in the field

18   training report "given the tenor of the field training officer's scrutiny of his trainee

19   Deputy."  ECF No. 60 at 8.

20         Based on the record, the Court finds that M.E.W. consented to the individual

21   Defendants' entry and subsequent search of the Wagner family home.

ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT ~ 18

1

### iii.    Parental Objection

2    Ms. Wagner contends that this a case of "disputed consent" because the

3    individual Defendants knew or suspected that Ms. Wagner would not allow their

4    entry given the family's history of non-cooperation with CPS and prior IFF visits.

5    ECF No.  55 at 17–18.

6    The Supreme Court in *Georgia v. Randolph* held that one co-tenant's consent

7    may not prevail over another co-tenant's objection where the latter is physically

8    present.  547 U.S. at 114–15.  In so holding, the Court found that reasonableness

9    does not require "police to take affirmative steps to find a potentially objecting co-

10    tenant before acting on the permission they had already received."  *Randolph*, 547

11    U.S. at 121–22.  The Court later emphasized that its holding in *Randolph* was

12    limited to situations where the objecting occupant is present.  *Fernandez v.*

13    *California*, 571 U.S. 292, 301 (2014), *abrogating United States v. Murphy*, 516 F.3d

14    117 (9th Cir. 2008).

15    Notwithstanding the family's history of non-cooperation with IFF visits, Ms.

16    Wagner was not physically present to communicate her objection.  ECF Nos. 38-1 at

17    3–4; 42 at 3.  Thus, this is not a case of "disputed consent" and *Randolph* is

18    inapplicable.  *See Randolph*, 547 U.S. at 126 (Breyer, J., concurring) ("The Court's

19    opinion does not apply where the objector is not present 'and object[ing]'").

20

21

ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT ~ 19

Accordingly, summary judgment is appropriate in favor of Defendants on Ms. Wagner's § 1983 claim premised on a violation of the Fourth Amendment for entering and searching the home.

## 2. Interview of M.E.W.

Ms. Wagner asserts that the individual Defendants violated the Fourth Amendment because their interview of M.E.W. was an impermissible seizure of M.E.W. absent parental consent. ECF No. 55 at 19.

Parents cannot assert that the seizure of their child violated their own Fourth Amendment rights. *See Mabe v. San Bernardino Cty, Dep't. of Pub. Social Servs.*, 237 F.3d 1101, 1111 (9th Cir. 2001) ("[Mother] has no standing to claim a violation of [child's] Fourth Amendment rights."). In reply to the present motion, Ms. Wagner asserts that the interview of M.E.W. violated "the rights of parents and child." ECF No. 55 at 20. Moreover, the Defendants moved for summary judgment on the merits of whether M.E.W. or the other Wagner children were "seized" in violation of the Fourth Amendment; thus, the individual Defendants have not been prejudiced by any "linguistic imprecision" on Ms. Wagner's part in drafting the Complaint. *Kirkpatrick v. Cty. of Washoe*, 843 F.3d 784, 790 (9th Cir. 2016).

"The Fourth Amendment protects a child's right to be free from unreasonable seizure by a social worker." *See Kirkpatrick v. County. of Washoe*, 843 F.3d 784, 790–91 (9th Cir. 2016) (en banc). A seizure occurs when, in light of all the circumstances, a reasonable person would have believed that he or she was not free

1   to leave.  *Dees*, 960 F.3d at 1154 (finding that the district court erred in finding that

2   child was seized as a matter of law where interview at school lasted for five minutes

3   and police officer was not present); *see also Doe v. Heck*, 327 F.3d 492, 509–10 (7th

4   Cir. 2003) (removal of child from classroom at private school to conduct twenty-

5   minute interview as part of investigation of child abuse constituted a search and

6   seizure under the Fourth Amendment).  "Whether a person is being compelled to

7   answer an official's questions, rather than freely consenting to answer them, is a

8   question of fact."  *Dees*, 960 F.3d at 1154 (quoting *United States v. Ryan*, 548 F.2d

9   782, 789 (9th Cir. 1976)).

10          The interaction between M.E.W. and the individual Defendants differs from

11  *Doe v. Heck*, cited by Ms. Wagner in support of her argument that M.E.W. was

12  seized in violation of the Fourth Amendment, in two material ways.  First, neither

13  M.E.W. nor the other Wagner children were removed from the home, separated from

14  each other, or otherwise prohibited from moving freely within the home during the

15  individual Defendants' IFF visit.  ECF Nos. 39 at 4; 43 at 4.  Second, the brief

16  questioning by Defendants Garr and Underwood was limited to the parents'

17  whereabouts and ensuring the safety of the children, rather than directed at the

18  merits of an underlying investigation.  ECF No. 39 at 2; 43 at 2.  The interview

19  continued only upon M.E.W.'s allowing the individual Defendants inside the home.

20  ECF No. 39 at 3; 43 at 3.  The nature of the questioning by Defendants Garr and

21  Underwood did not seek to elicit intimate family details, but rather, only those

ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT ~ 21

1   related to basic necessities for the children.  ECF No. 39 at 3; 43 at 2.  The IFF visit

2   also was not part of an ongoing law enforcement investigation.  ECF No. 51 at 3.

3       Given the totality of the circumstances, the Court finds that M.E.W. was not

4   seized in violation of the Fourth Amendment based on the brief questioning

5   conducted by Defendants Garr and Underwood.  Accordingly, summary judgment is

6   appropriate in favor of Defendants on Ms. Wagner's § 1983 claim premised on a

7   violation of M.E.W.'s right Fourth Amendment against unreasonable seizure.

8       Since the Court has found that Ms. Wagner's constitutional rights were not

9   violated, the Court need not address the second inquiry with respect to whether the

10  individual Defendants are entitled to qualified immunity.

11  **II.    County of Spokane's Liability under *Monell***

12      Ms. Wagner claims that the County of Spokane is liable for the individual

13  Defendants' actions pursuant to *Monell v. Dep't of Social Servs. of New York*, 436

14  U.S. 658, 691–94 (1978).  ECF No. 1 at 33.  However, *Monell* violations are

15  "contingent on a violation of constitutional rights."  *Scott v. Henrich*, 39 F.3d 912,

16  916 (9th Cir. 1994) (holding that "municipal defendants cannot be held liable

17  because no constitutional violation occurred").  Finding that the individual

18  Defendants did not violate Ms. Wagner's constitutional rights, the County of

19  Spokane cannot be held liable because no constitutional violations occurred.

20      Assuming *arguendo* that a constitutional violation occurred, which this Court

21  does not find, a municipality may not be held liable on a theory of *respondeat*

ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT ~ 22

*superior* for the actions of their employees and agents.  *Id*.  Instead, the local

government's actions must have caused the constitutional violation.  A section 1983

plaintiff may establish municipal liability in one of three ways:

> 1. The plaintiff may prove that a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity; or
>
> 2. The plaintiff may establish that the individual who committed the constitutional tort was an official with "final policy-making authority" and that the challenged action itself thus constituted an act of official governmental policy; or
>
> 3. The plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it.

*Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992).

First, there is no evidence that the alleged constitutional violations occurred

pursuant to a County policy or longstanding practice.  *See Mabe*, 237 F.3d at 1111;

*see also Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) ("Liability . . . must be

founded upon practices of sufficient duration, frequency and consistency that the

conduct has become a traditional method of carrying out policy.").

Ms. Wagner argues that the County is liable due to gaps in existing policies

regarding welfare checks.  ECF No. 54 at 19.  *See Long v. County of Los Angeles*,

442 F.3d 1178, 1189 (9th Cir. 2006) ("This court consistently has found that a

county's lack of affirmative policies or procedures to guide employees can amount

to deliberate indifference, even when the county has other general policies in

ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT ~ 23

1  place.").  However, the evidence shows that adequate policies are in place and do not

2  amount to "deliberate indifference."

3      Defendants Garr and Underwood testified that it is standard practice when

4  conducting an IFF to check on food availability and to ensure adequate sleeping

5  arrangements for the children, provided they obtain consent to enter the home.  ECF

6  Nos. 39 at 2–3; 42 at 2–3.  This policy, predicated on receiving consent or the

7  existence of other exigent circumstances prior to entry, does not amount to deliberate

8  indifference.

9      Spokane County Sheriff's Office Training Bulletin No. 330, governing

10  Protective Custody and CPS, provides that "CPS might call for deputies to

11  accompany them when interviewing people they believe are dangerous or might

12  pose a threat to the clients or CPS workers.  Deputies act in a 'back up' role unless

13  they see or develop probable cause for a crime."  ECF No. 58-5 at 2.  Spokane

14  County Sheriff's Office Training Bulletin 418, governing Animal Control, provides

15  that "Deputies may be dispatched to animal related calls and should take appropriate

16  actions to control the situation or until the arrival of Spokane County Regional

17  Animal Protection Services (SCRAPS)."  ECF No. 58-8.  Accordingly, there are

18  adequate policies in place to address situations involving welfare checks.

19      Second, there is no evidence suggesting that the individual Defendants have

20  "final policymaking authority" to render their actions an act of official governmental

21  policy.  Defendants Garr and Underwood receive directives with respect to emergent

ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT ~ 24

IFF visits from a CPS Supervisor.  ECF No. 42 at 3. 42-1.  As evidenced by Spokane County Sheriff's Office Training Bulletins Nos. 330 and 418, these policies are issued by elected Spokane County Sheriff Ozzie D. Knezovich.  ECF Nos. 58-5; 58-5; *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 ("When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality.").  Accordingly, the evidence does not support a conclusion that the individual Defendants are "final policymakers."

Finally, there is no argument or evidence before the Court which suggests that an official with "final policy-making authority" ratified the individual Defendants' decision to enter the Wagner family home.

To the extent that Ms. Wagner's *Monell* claim is based on a lack of training, a single unconstitutional incident, without more, does not establish that a municipality failed to provide proper training.  *Kirkpatrick v. Cty. of Washoe*, 843 F.3d 784, 796 (9th Cir. 2016) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 821–24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)).

Rather, the record indicates that the individual Defendants received proper training on the contours of the Fourth Amendment.  Defendants Garr and Underwood testified that they participated in the "Core Training" required for CPS social workers which covers policies and realistic job training, including when it is acceptable and lawful to enter a home.  ECF Nos. 39 at 2; 43 at 2.  Ms. Wagner

ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ~ 25

concedes that the Deputies received training regarding when it is lawful to enter a home. ECF No. 54 at 11. The Deputies also attest to this training. ECF Nos. 39 at 2; 43 at 2. Based on their training and experience, Deputies Benner, Turner, and Moman assert that they know a warrant is required to enter a residence unless they obtain consent or there are exigent circumstances. ECF Nos. 50 at 3; 51 at 3–4; 52 at 2. Thus, there is no evidence imputing liability to the County based on an alleged lack of training.

Therefore, even if there was a constitutional violation, the County of Spokane would not be liable pursuant to *Monell*.

Accordingly, **IT IS HEREBY ORDERED**:

1.    Defendants Garr and Underwood's Motion for and Memorandum in Support of Summary Judgment, **ECF No. 35**, is **GRANTED**.

2.    Defendants County of Spokane, Moman, Turner, and Benner's Motion and Memorandum of Authorities Supporting Summary Judgment Dismissal, **ECF No. 47**, is **GRANTED**.

3.    Judgment shall be entered for all Defendants on all claims.

4.    Any remaining, pending motions are **DENIED AS MOOT**, and any hearing dates are **STRICKEN**.

/ / /

/ / /

1    **IT IS SO ORDERED**.  The District Court Clerk is directed to enter this

2    Order, enter Judgment as directed, provide copies to Plaintiff and counsel, and **close**

3    **this case**.

4        **DATED** December 9, 2020.

5

6                               *s/ Rosanna Malouf Peterson*
                               ROSANNA MALOUF PETERSON
                               United States District Judge
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT ~ 27